# EXHIBIT 1

Detroit_4387348_1

RECEIVED AND FILED KENT COUNTY
CIRCUIT COURT - 11/6/2025 3:09:00 PM

Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN | | | CASE NO. |
|---|---|---|---|
| KENT | JUDICIAL DISTRICT | **SUMMONS** | 25-___-21001_____CBB |
| | JUDICIAL CIRCUIT | | |
| | COUNTY | | |

| Court address | Court telephone no. |
|---|---|
| 180 Ottawa Avenue NW, Suite 2400, Grand Rapids, MI 49503 | (616) 632-5480 |

| Plaintiff's name, address, and telephone no. | | Defendant's name, address, and telephone no. |
|---|---|---|
| STEELCASE INC.<br>901 44th Street, SE<br>Grand Rapids, MI 49508 | v | Blu Dot Design & Manufacturing, Inc.<br>1323 Tyler Street Northeast<br>Minneapolis, MN 55413 |

| Plaintiff's attorney, bar no., address, and telephone no. | |
|---|---|
| Mark S. Pendery (P57683)<br>Honigman LLP<br>200 Ottawa Avenue, NW, Suite 700<br>Grand Rapids, MI 49503 | HON. CURT A. BENSON<br>(P-38891) |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer  pending.

Summons section completed by court clerk.   **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>11/7/2025 | Expiration date*<br>2/6/2026 | Court clerk<br>LISA POSTHUMUS LYONS |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

Summons   (3/23)

Case No. 25-  21001-CBB

PROOF OF SERVICE

**TO PROCESS SERVER**: You must serve the summons and complaint and file proof of service with the court clerk before the expiration date on the summons. If you are unable to complete service, you must return this original and all copies to the court clerk.

CERTIFICATE OF SERVICE / NONSERVICE

☐ I served   ☐ personally   ☐ by registered or certified mail, return receipt requested, and delivery restricted to the the addressee (copy of return receipt attached)    a copy of the summons and the complaint, together with the attachments listed below, on:

☐ I have attempted to serve a copy of the summons and complaint, together with the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

☐ I am a sheriff, deputy sheriff, bailiff, appointed court officer or attorney for a party.

☐ I am a legally competent adult who is not a party or an officer of a corporate party. I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Fee | | Signature |
|---|---|---|---|---|
| $ | | $ | | |
| Incorrect address fee | Miles traveled | Fee | TOTAL FEE | Name (type or print) |
| $ | | $ | $ | |

ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of a copy of the summons and complaint, together with

_____ on _____
Attachments (if any)                        Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

MCL 600.1910, MCR 2.104, MCR 2.105

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

STEELCASE INC.,

        Plaintiff,

vs.

BLU DOT DESIGN & MANUFACTURING, INC.,

        Defendant.

Civil Action No. 25-_21001____CBB

Hon. ___HON. CURT A. BENSON (P-38891)___

**CASE TO BE ASSIGNED TO BUSINESS COURT**

---

Mark S. Pendery (P57683)
Honigman LLP
200 Ottawa Avenue NW
Suite 700
Grand Rapids, MI 49503
616.649.1910
mpendery@honigman.com
*Attorneys for Plaintiff*

                              /

## COMPLAINT

There is no other pending or resolved civil action arising out of this transaction or occurrence alleged in the Complaint.

Pursuant to MCL 600.8031 and MCR 2.112(O), this case involves a business or commercial dispute and meets the statutory requirements to be assigned to the Business Court.

**NOW COMES** Plaintiff, Steelcase Inc. ("Steelcase"), by and through its attorneys, Honigman LLP, and for its Complaint against Blu Dot Design & Manufacturing, Inc. ("Blu Dot"), states as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Steelcase is a corporation organized under the laws of the State of Michigan, with its principal place of business located in Kent County, Michigan.

62735154.1

2. Defendant, Blu Dot, is a corporation organized in the State of Minnesota. Blue Dot conducts business in the State of Michigan.

3. This Court has subject matter jurisdiction because the amount in controversy is in excess of $25,000.00.

4. Venue and jurisdiction are proper in this Court because the parties agreed to venue and jurisdiction in the State of Michigan, specifically Kent County, under Paragraph B of ARTICLE IV. GENERAL PROVISIONS found in the Partnership Program Agreement entered into by the parties on October 18, 2016. See **Exhibit A.** Also see MCL 600.711 and/or MCL 600.1621.

## COMMON ALLEGATIONS

5. Steelcase incorporates paragraphs 1 through 4 as though fully set forth here.

6. On or about October 16, 2016, Steelcase and Blu Dot entered into the Partnership Program Agreement (the "Agreement"), attached as **Exhibit A.**

7. Pursuant to ARTICLE II. SPECIFIC COVENANTS AND OBLIGATIONS OF THE PARTIES, paragraphs 5 and 6, Blu Dot was required to pay Partner Fees and Logistics and Transportation Fees to Steelcase in exchange for access to Steelcase services, sales networks and other support to Blu Dot.

8. Steelcase submitted monthly invoices to Blu Dot for several years for the Partner Fees and the Logistics and Transportation Fees.

9. Blu Dot regularly paid since October 18, 2016, the contractually obligated Partner Fees and Logistics and Transportation Fees until recently when Blu Dot refused to pay Steelcase the required Partner Fees and Logistics and Transportation Fees.

10. Blu Dot currently owes Steelcase $951,940, plus interest.

2

## COUNT I—BREACH OF CONTRACT

11.    Steelcase incorporates paragraphs 1 through 10 as though fully set forth here.

12.    Steelcase and Blu Dot entered into the Agreement where Steelcase was to provide access to Steelcase services, sales networks and other support to Blu Dot. Blu Dot was required to pay Steelcase Partner Fees and Logistics and Transportation Fees.

13.    Steelcase performed all of its obligations under the Agreement and tendered to Blu Dot copies of monthly invoices for Partner Fees and Logistics and Transportation Fees to be paid by Blu Dot to Steelcase.

14.    Blu Dot recently refused and/or failed to pay the balance of invoices sent to Blu Dot in the amount of $951,940.

15.    Blu Dot's refusal and/or failure to pay the Partner Fees and Logistics and Transportation Fees constitutes a material breach of the Agreement.

16.    As a direct and proximate cause of Blu Dot's breach of contract, Steelcase has suffered actual damages in the amount of $951,940, plus interest to date, as well as continually accruing interest, consequential, incidental and common law damages.

WHEREFORE, Steelcase prays that this Court will enter judgment in favor of Steelcase and against Blu Dot in the amount of $951,940, together with interest, costs, expenses, attorney's fees and grant such other and further relief as this Court deems just and equitable.

## COUNT II—ACCOUNT STATED

17.    Steelcase incorporates 1 through 16 as though fully set forth here.

62735154.1

18.    Pursuant to the Agreement between Steelcase and Blu Dot, Steelcase agreed to provide access to Steelcase services, sales networks and other support to Blue Dot in exchange for Blu Dot's promise to pay Partner Fees and Logistics and Transportation Fees to Steelcase.

19.    In accordance with the Agreement, Steelcase did provide Blu Dot access to Steelcase services, sales networks and support to Blu Dot.

20.    Having performed its obligations under the Agreement, Steelcase delivered invoices to Blu Dot reflecting the total owed for Partner Fees and Logistics and Transportation Fees.

21.    The outstanding balance due and owing Steelcase by Blu Dot, before interest, is $951,940.  See **Exhibit B** Affidavit of Account.

22.    At no time did Blu Dot object to the invoices sent by Steelcase to Blu Dot. In fact, high level executives at Blu Dot agreed that Blu Dot owed $951,940 to Steelcase.

23.    Blu Dot's failure to challenge or otherwise object to the invoices or amount owed has rendered it an account stated.

24.    Despite repeated requests, Blu Dot has refused to and/or failed to pay the outstanding debt owed to Steelcase.

WHEREFORE, Steelcase prays that this Court enter judgment in favor of Steelcase and against Blu Dot in the amount of $951,940, together with interest, costs, expenses, attorney's fees and grant such other and further relief as this Court deems just and equitable.

## COUNT III—UNJUST ENRICHMENT

25.    Steelcase incorporates paragraphs 1-24 as though fully set forth here.

26.    Steelcase provided access to Steelcase services, sales networks and support to Blu Dot at the request of Blu Dot.

4

62735154.1

27.    Blu Dot received the benefits of accessing Steelcase services, sales networks and support to Blu Dot.

28.    Unless Blu Dot is required to pay the agreed upon Partner Fees and Logistics and Transportation Fees as outlined in the Agreement, Blu Dot will be unjustly enriched in the amount of $951,940, plus common law damages for lost use of such funds to the detriment of Steelcase.

WHEREFORE, Steelcase prays that this Court enter judgment in favor of Steelcase and against Blu Dot in the amount of $951,940, together with interest, costs, expenses, attorney's fees and grant such other and further relief as this Court deems just and equitable.

Respectfully submitted,

HONIGMAN LLP
Attorneys for Plaintiff

By:/s/ Mark S. Pendery
    Mark S. Pendery (P57683)
    200 Ottawa Avenue NW
    Suite 700
    Grand Rapids, MI 49503-2308
    616.649.1910
    Mpendery@honigman.com

Dated:  November 6, 2025

# EXHIBIT A

# PARTNERSHIP PROGRAM AGREEMENT

THIS PARTNERSHIP PROGRAM AGREEMENT (the "Agreement") dated as of this 18 day of October, 2016 (the "Effective Date") by and between **BLU DOT DESIGN & MANUFACTURING, INC.**, a Minnesota corporation, of 1323 Tyler Street Northeast, Minneapolis, MN 55413 ("Program Partner"), and **STEELCASE INC.**, a Michigan corporation, of 901 44th Street S.E., Grand Rapids, Michigan 49508 ("Steelcase").

## RECITALS:

A.    Steelcase is engaged in the business of manufacturing, selling and distributing office furniture and related products and services to and through select independent authorized Steelcase dealers (individually, an "Authorized Steelcase Dealer" or collectively, "Authorized Steelcase Dealers").

B.    Program Partner is in the business of sourcing, manufacturing, selling and distributing contemporary furniture and other offerings through traditional brick-and-mortar retail shops and through its e-commerce platform located on the Internet at www.bludot.com.

C.    Steelcase and Program Partner have expressed a desire to enter into this Agreement whereby products of Program Partner identified from time-to-time as described on Exhibit A ("Product" or "Products") shall be offered through Authorized Steelcase Dealers (collectively, the "Steelcase Dealer Channel") throughout the United States (the "Territory"). Program Partner and Steelcase desire to expand the Territory in the future to include offering Products in Canada through Authorized Steelcase Dealers.

D.    Steelcase and Program Partner have also agreed that Steelcase will perform certain e-catalogue services as well as logistics services relating to the sale and distribution of Products throughout the Territory, all as further defined in Article II, Section A2 below (collectively, the "Services").

E.    The parties have reached agreement on the terms and conditions of the proposed alliance and desire to set forth their understanding with respect to the alliance in writing.

NOW, THEREFORE, in consideration of the mutual promises and covenants and undertakings contained, the parties hereto agree as follows:

## ARTICLE I. SALE OF PROGRAM PARTNER PRODUCTS

A.    **Sale of Program Partner Products through Steelcase Dealer Channel.** Program Partner and Steelcase hereby agree to the following terms, provisions and conditions under which Program Partner may offer for sale and sell Products to Authorized Steelcase Dealers through the Steelcase Dealer Channel. The description of Products set forth on Exhibit A may be modified from time-to-time by written agreement executed by both of the parties to this Agreement. Notwithstanding anything to the contrary, Program Partner may, from time to time, in its sole discretion, and upon written notice to Steelcase of not less than sixty (60) days: (i)

discontinue the sale of certain of the Products; and (b) effect changes to any of the Products or parts/accessories related thereto. Program Partner acknowledges that neither Steelcase nor any Authorized Steelcase Dealer is obligated to purchase or sell any Products in connection with this Agreement. Steelcase and Program Partner acknowledge and agree that there will be no COM, specials or other such offerings for Products under this Agreement.

1.     Ordering; Process for Product Purchases by Authorized Steelcase Dealers. Steelcase agrees to assist in the introduction of Products to the Steelcase Dealer Channel and to recommend the sale of Products through the Steelcase Dealer Channel by Authorized Steelcase Dealers. Beginning on the Effective Date and continuing for a period of up to one hundred twenty (120) days thereafter, Program Partner may receive orders for Products from Authorized Steelcase Dealers using a manual process or through Program Partner's current ordering processes. Within one hundred twenty (120) days after the Effective Date, orders for Products from Authorized Steelcase Dealers will be processed through the Hedberg Data System or such similar electronic process as Steelcase may determine in its sole discretion. Notwithstanding anything to the contrary herein, all purchase orders facilitated by Steelcase are subject to approval, rejection or modification by Program Partner in its reasonable discretion. Changes to orders shall be coordinated between Program Partner, the applicable Authorized Steelcase Dealer and, when necessary, with assistance from Steelcase.

2.     Pricing. Program Partner shall sell Products to Authorized Steelcase Dealers at the prices and on the terms set forth in the initial price list for the Products as determined by Program Partner, as described on Exhibit A ("Price List"). The Price List represents Program Partner's current, published MSRP for Products sold throughout the Territory. Program Partner will provide discounts per individual, project-based order of Products by an Authorized Steelcase Dealer as follows:

   a.   For orders of Products with an aggregate MSRP between $1.00 and $10,000.00, a discount of 25% off Price List for the entire order;

   b.   For orders of Products with an aggregate MSRP between $10,000.01 and $20,000.00, a discount of 30% off Price List for the entire order; and

   c.   For orders of Products with an aggregate MSRP in excess of $20,000.00, a discount of 35% off Price List for the entire order.

The discounts will apply only to Products purchased by Authorized Steelcase Dealers in accordance with Article I, Section A1 above ("Qualifying Sales"). The discounted price off of the Price List shall be "Dealer Purchase Price." For clarity, Dealer Purchase Price excludes all freight charges.

With respect to orders in excess of $20,000.00 only, Program Partner acknowledges and agrees for the duration of this Agreement, that any discount for Products offered or provided to any of Steelcase's major competitors as identified in Article II Section B.1 below or their respective dealers that results in a Dealer Purchase Price lower than 30%

off Price List will constitute a price reduction and will result in an equivalent improvement in the pricing offered and provided by Program Partner to Authorized Steelcase Dealers hereunder. Subject to applicable law, this relationship between the pricing offered and provided by Program Partner to Authorized Steelcase Dealers hereunder and the pricing offered and provided by Program Partner to Steelcase's major competitors as identified in Article II Section B.1 below (and their respective dealers) shall be maintained throughout the duration of this Agreement.

The Price List of any Products may be changed only after the expiration of ninety (90) days following Steelcase's receipt of written notice from Program Partner of the new list price of any specific Product. Program Partner will typically issue new list prices for Products annually each March.

Notwithstanding the foregoing, in no event will any price charged to Authorized Steelcase Dealers for Products under this Agreement be more than that charged to any other office furniture dealer of Products in the same geographical market for Products, or substantially the same Products, and under the same or similar circumstances after giving effect to all applicable discounts.

3. **Tradenames and Trademarks.** Except as expressly set forth herein, Program Partner's intellectual property (including, without limitation, patents, inventions, trademarks, domain names, copyrightable material, trade secrets, and all rights, interests and protections associated therewith) is the sole and exclusively property of Program Partner. Steelcase shall not acquire any ownership interest or rights in any of Program Partner's intellectual property, and any goodwill derived from use by Steelcase of Program Partner's intellectual property inures to the benefit of Program Partner. Steelcase shall use Program Partner's intellectual property for the sole purpose of performing its obligations under this Agreement and only in accordance with this Agreement and the instructions of Program Partner. During the term of this Agreement, on a non-exclusive, non-sublicensable, non-transferable, and limited basis, Steelcase is authorized to use Program Partner's trade name or any trademarks in connection with the promotion and marketing of the Products in the Territory. In the event any Product is designed by a third party designer, Program Partner agrees to use commercially reasonably efforts to make the designer available for Product promotion via Steelcase sales channels and to license any rights Program Partner has to use the designer's image, likeness, and/or signature or trademark different than a previously approved use, Steelcase will in each instance obtain written approval, which shall not be unreasonably withheld, from Program Partner with respect to all press releases, marketing materials, and other material and uses, which use Program Partner's trade name or trademarks. Program Partner and Steelcase shall use reasonable commercial efforts to exchange drafts and updates to such materials in order to provide timely promotion and marketing efforts of the Products. Upon termination of this Agreement, Steelcase will discontinue any and all use, including any previously approved use, of Program Partner's trade name or trademarks and any other Program Partner intellectual property.

## ARTICLE II. SPECIFIC COVENANTS AND OBLIGATIONS OF THE PARTIES

A.    **Obligations of Steelcase.** In consideration of the promises and obligations of Program Partner under this Agreement, Steelcase covenants and agrees as follows:

1.    **Promotion of Products.** Steelcase will make Product information available on its marketing technology platforms used to support the Steelcase Dealer Channel as more fully described in Section 2b below. Any use of Product information or descriptions or other Program Partner content must be approved in writing by Program Partner before Steelcase makes such information available to Authorized Steelcase Dealers. For the duration of this Agreement, Program Partner shall offer Products to Authorized Steelcase Dealers and Steelcase for promotional purposes (use and display in showrooms) with a discount of 50% off Price List.

2.    **Steelcase Services.** During the term of this Agreement and in order to facilitate and improve the sale of Products through the Steelcase Dealer Channel consistent with its needs and expectations, Steelcase shall provide the following Services:

a. Logistics and Transportation. Within one hundred twenty (120) days of the Effective Date of this Agreement, Steelcase will be responsible for facilitating and moving Products ordered by Authorized Steelcase Dealers from Program Partner's facilities as further described on the attached **Exhibit B**. Only Qualifying Sales shall be eligible for Steelcase's logistics and transportation services described on Exhibit B.

b. SmartTools/eCatalogue. Within one hundred twenty (120) days of the Effective Date of this Agreement, Steelcase will digitize Product descriptions and related information for use in SmartTools and the Hedberg Data System to allow Authorized Steelcase Dealer personnel, Steelcase consultants, A&D professionals and other specifiers to position Products and to facilitate the ordering and sale of Products. Program Partner and Steelcase will coordinate the delivery and use of Program Partner Product information and the automation of the Product ordering process hereunder as described on the attached **Exhibit C.**

c. Training. Steelcase will, with reasonable assistance from Program Partner, prepare and distribute product training guidelines for Steelcase sales and Authorized Steelcase Dealer teams to market and sell Products.

B.    **Obligations of Program Partner.** In consideration of Steelcase's promises and obligations under this Agreement, Program Partner hereby covenants and agrees as follows:

1.    **Exclusive Distribution.** Beginning on the Effective Date and during the remaining term of this Agreement, Program Partner will not enter into a similar agreement or similar relationship with any of Steelcase's major competitors (including their subsidiary companies) as follows: Haworth, Herman Miller, HON, Allsteel, Knoll and Teknion. Except with respect to the foregoing, Program Partner shall not be

prohibited from its standard distribution practices, including through independent dealers (including independent dealers who carry and sell some or all of the aforementioned brands).

2.    **Product Quality and Testing.** Program Partner is responsible for any industry certification and testing relating to the Products. Program Partner represents and warrants that each of the Products will comply with its description as set out in the digital files Program Partner provides Steelcase for input into the Freiberg Data System from time to time, will be fit for any purpose held out by Program Partner, and will comply fully with any specification mentioned or referred to in the Program Partner's marketing and promotion materials for the Products.

3.    **Engineering, Drawing, CAD, Other Data.** Promptly following the Effective Date of this Agreement, Program Partner will provide engineering drawings, CAD, and other data as reasonably requested by Steelcase to allow Steelcase to digitize Products for sales and specification tools.

4.    **No Set-Up and Maintenance Costs.** Neither party will be required to reimburse the other party for any set-up or maintenance costs in connection with this Agreement. Each party shall, at its own expense, obtain and maintain required certifications, credentials, licenses and permits necessary to conduct business in accordance with this Agreement.

5.    **Partner Fees.** During the term of this Agreement and in consideration of Steelcase's covenants and agreements hereunder, Program Partner shall pay Steelcase a monthly fee (the "Partner Fees") equal to the sum of the following:

(i) Fourteen percent (14%) of the Dealer Purchase Price for all Products purchased by Authorized Steelcase Dealers on orders up to $10,000.00 (exclusive of freight); plus

(ii) Twelve percent (12%) of the Dealer Purchase Price for all Products purchased by Authorized Steelcase Dealers on orders between $10,000.01 and $20,000.00 (exclusive of freight); plus

(iii) Ten percent (10%) of the Dealer Purchase Price for all Products purchased by Authorized Steelcase Dealers on orders in excess of $20,000.00 (exclusive of freight).

The obligation to pay Partner Fees will apply only to Qualifying Sales. Sales other than Qualifying Sales will not require any payment from Program Partner to Steelcase. The Partner Fees shall be paid to Steelcase by Program Partner within thirty (30) days of the last day of each month. Steelcase will provide Program Partner an account statement that will contain sufficient details and information along with each payment of Partner Fees to support the calculation of such payment. If any Products are returned for any

reason other than a manufacturing defect, the Partner Fees paid to Steelcase in connection with the returned Products shall be deducted from the next month's invoice.

6. Logistics and Transportation Fees. Steelcase shall pay all logistics and transportation costs and expenses for Qualifying Sales with respect to which Steelcase provides transportation and logistics services hereunder. During the term of this Agreement, Program Partner shall pay to Steelcase a monthly logistics fee equal to ten percent (10%) of the MSRP of Qualifying Sales for that month with respect to which the Steelcase provides transportation and logistics services (the "Logistics Fees"). The Logistic Fees shall be invoiced on a monthly basis by Steelcase directly to Program Partner, and undisputed fees shall be paid within thirty (30) days of the date of the invoice. In the event Products are returned as a result of a manufacturing defect on the part of Program Partner, there will be no refund of the Logistic Fees paid by Program Partner to Steelcase, and Program Partner will additionally reimburse Steelcase for the costs and expenses of any additional logistics or transportation associated with such return. In the event Products are returned as a result of damage to Products associated with logistics and transportation, the Logistic Fees paid to Steelcase in connection with the returned Products shall be refunded to Program Partner, and Steelcase will be responsible for all additional costs and expenses of logistics or transportation associated with such return. Any adjustments to Logistic Fees payable or cost reimbursements attributable to returns will be reflected in the next month's invoice in sufficient detail. Steelcase shall bear responsibility for any damage to Products during transport from Program Partner's location, provided damage is clearly illustrated by external damage or destruction to the Product packaging.

7. Lead Times for Delivery of Products. During the term of this Agreement, Program Partner shall provide Products on lead times that are consistent with the standard published lead times as established by Program Partner from time to time and consistent with the needs of the Steelcase Dealer Channel. More specifically, Program Partner agrees that it will:

  i.   Use commercially reasonable efforts to satisfy a four (4) week maximum lead-time for delivery of Products unless Program Partner provides Steelcase notice of a change in lead-times upon submission of a purchase order by an Authorized Steelcase Dealer;

  ii.   Achieve commercially reasonable safety stock levels to help achieve on-time order fulfillment of Products; and

  iii.   Update Steelcase of standard lead times on a regular basis.

8. Warranty. Program Partner warrants that Products sold to Authorized Steelcase Dealers shall be free from material defects in workmanship and operation for a period of one (1) year from the date of sale. Program Partner shall be responsible for and bear the costs associated with the repair or replacement of Products that are deemed defective including any related shipping or handling costs associated with the return of

defective Products to Steelcase or any Authorized Steelcase Dealer. Program Partner's standard warranty is attached as Exhibit D. Notwithstanding anything to the contrary in this Agreement, Steelcase shall not directly or indirectly make any representations, warranties, guarantees, indemnities, similar claims or other commitments: (a) actually, apparently or ostensibly on behalf of Program Partner, or (b) to any customer with respect to the Products, which representations, warranties, guarantees, indemnities, similar claims or other commitments are additional to or inconsistent with the standard warranty terms attached as Exhibit D or any other statements or commitments that Program Partner has authorized Steelcase in writing to make to others.

9.     Packaging of Products. Program Partner will be responsible for the packaging and labeling of Products as necessary to be efficiently loaded and transported in accordance with Steelcase's shipping requirements and the requirements set forth in Exhibits C and D.

10.     Reporting. Program Partner will appoint a program manager whose responsibilities will include maintaining complete and accurate accounting records in accordance with generally accepted accounting principles to support and document the fees payable to Steelcase on a monthly basis. Such records will be made available to Steelcase or its representatives upon the reasonable request of Steelcase; provided that Steelcase and its representatives will keep such records confidential in the manner set forth in Article III, Section G below, that such right cannot be exercised more than once per calendar year.

## ARTICLE III. MUTUAL UNDERTAKINGS AND AGREEMENTS

A.     Term. Subject to the termination provisions set forth below, the term of this Agreement will commence on the Effective Date and shall continue for one (1) year (the "Initial Term"). This Agreement shall automatically renew for one additional successive year (the "Renewal Term") at the end of the Initial Term. During the Initial Term and any Renewal Term, each party may terminate this Agreement without cause by providing the other party with a written notice of at least ninety (90) days prior to the end of the Initial Term or any Renewal Term) that such party is terminating this Agreement effective as of the end of such time period. Any section intended to survive the expiration or termination of this Agreement will survive (including, without limitation, the indemnification and confidentiality provisions).

B.     Termination by Steelcase. Steelcase may terminate this Agreement upon the occurrence of any of the following:

i.     Program Partner breaches, is in default, or fails to perform any of its obligations set forth in this Agreement in any material respect and such material breach, default or failure to perform, which is reasonably capable of being cured, is not cured according to the following sentence. Steelcase shall give Program Partner a written notice of the occurrence specifying the nature of the default or failure to perform and affording Program an opportunity to cure such default within (i) ten (10) days in the case of any other nonpayment of money due Steelcase, or (ii) fifteen (15) days in the case of any other

default, following Program Partner's receipt of the notice. If any default is not cured to the reasonable satisfaction of Steelcase within the applicable period, this Agreement and all rights and privileges of Program Partner hereunder shall automatically terminate without further action by Steelcase; or

ii.    Program Partner makes an assignment for the benefit of creditors or becomes the subject of any proceeding in bankruptcy or under any insolvency laws, whether voluntary or involuntary, and including any reorganization proceedings; or

iii.    Any attempted assignment or transfer of this Agreement by Program Partner, by operation of law or otherwise, unless the prior written consent of Steelcase to such assignment or transfer has been obtained.

Notwithstanding the foregoing, upon termination of this Agreement pursuant to Article III, Section B (i)-(iii), Program Partner shall not directly or indirectly enter into a similar arrangement or relationship with Steelcase's major competitors identified in Article II, Section B.1 above for a period of six (6) months following the date of such termination. Except with respect to the foregoing, Program Partner shall not be prohibited from its standard distribution practices in effect as of the Effective Date, including through independent dealers (including independent dealers who carry and sell products of Steelcase's major competitors).

C.    Termination by Program Partner. Program Partner may terminate this Agreement upon the occurrence of any of the following:

i.    Steelcase breaches, is in default of, or fails to perform any of its obligations set forth in this Agreement in any material respect and such material breach, default or failure to perform, which is reasonably capable of being cured, is not cured according to the following sentence. Program Partner shall give Steelcase a written notice of the occurrence, specifying the nature of the default or failure to perform and affecting Steelcase an opportunity to cure such default within (i) fifteen (15) following Steelcase's receipt of the notice. If any default is not cured to the reasonable satisfaction of Program Partner within the applicable period, this Agreement and all rights and privileges of Steelcase hereunder shall automatically terminate without further action by Program Partner; or

ii.    Steelcase makes an assignment for the benefit of creditors or becomes the subject of any proceeding in bankruptcy or under any insolvency laws, whether voluntary or involuntary, and including any reorganization proceedings; or

iii.    Any attempted assignment or transfer of this Agreement by Steelcase, by operation of law or otherwise, unless the prior written consent of Program Partner to such assignment or transfer has been obtained.

D.    Indemnification by Program Partner. Program Partner shall defend, hold harmless and indemnify Steelcase, its subsidiaries, and Authorized Steelcase Dealers for any and

all third party claims, suits, actions, damages and the like arising out of or in connection with (a) injury to person or damage to property arising from the use of any Products, (b) the infringement of any third party intellectual property under applicable intellectual property laws by any Product or by any trademark, trademark, or content provided by Program Partner expressly for use in the marketing and sale of the Products, or (c) any breach or violation of any covenant, representation, or warranty of Program Partner set forth herein, or (d) any claim by any governmental entity alleging that any action or statement made by Program Partner or its representatives in connection with Qualifying Sales violates any applicable law. Upon written notice of any such claim from Steelcase, Program Partner may, at Program Partner's sole cost and expense, carry out or take on the actual defense of any claim, suit, action, damage or the like through its legal counsel (provided Steelcase is given an opportunity to participate in or agree to the selection of counsel).

E. **Indemnification by Steelcase.** Steelcase shall defend, hold harmless and indemnify Program Partner and its subsidiaries for any and all third party claims, suits, actions, damages and the like arising out of or in connection with (a) any damages arising out or relating to the infringement of any third party intellectual property under applicable intellectual property laws by Steelcase, (b) any breach or violation of any covenant, representation, or warranty of Steelcase set forth herein, or (c) any claim by any governmental entity alleging that any action or statement made by Steelcase or its representatives in connection with its marketing and sale of the Products violates any applicable law. Upon written notice of any such claim from Program Partner, Steelcase may, at Steelcase's sole cost and expense, carry out or take on the actual defense of any claim, suit, action, damage or the like through its legal counsel (provided Program Partner is given an opportunity to participate in or agree to the selection of counsel).

F. **Insurance.** Each of the parties hereto will, at its own expense, maintain at all times while this Agreement are in effect, liability insurance in the amount of at least $1,000,000 per occurrence, and $5,000,000 in the aggregate, to cover general liability and product liability claims and, each party will name the other party as additional insured. Each party, upon execution of this Agreement shall provide the other party with a current certificate of insurance evidencing such coverage upon request. Each party's certificate will require the party's insurance company will give 30 days' prior written notice to the other party of the cancellation or material change to any such insurance policy.

G. **Confidentiality.** The parties hereto covenant and agree (i) not to disclose (b) any of the Confidential Business Information of the other party, or (b) any of the terms, conditions or provisions of this Agreement, in current form or as may be amended from time to time, to any other person or entity; and (2) not to use any of the Confidential Business Information and trade secrets of the other party for its own benefit or the benefit of any other person or entity, whether during or subsequent to the term of this Agreement. As used in this Agreement, the term "Confidential Business Information" includes, but is not limited to, the identity of, or other pertinent information with respect to actual or potential customers or customer contacts, bidding and pricing strategies and policies, market studies, penetration data or other marketing information, sales and marketing plans, programs and strategies, sales, costs and other financial data, research and development activities, information and plans, and plans for new products or services. The parties acknowledge and agree that their respective obligations to maintain the

confidentiality of the other party's Confidential Business Information shall extend until that particular information is made public by that other party or, was available to the party on a non-confidential basis prior to its disclosure to the other party. In addition, following the termination of this Agreement, the parties agree to return to the applicable party all Confidential Business Information of that other party; provided, that a party may retain one copy of any such Confidential Business Information solely for archival purposes and for purposes of disputes arising out of or relating to the performance of this Agreement. Additionally, notwithstanding the foregoing, either party may disclose a copy of the terms, conditions and provisions of this Agreement, other than pricing and similar information, to a third party or its representatives in connection with evaluation of a bona fide financing or acquisition transaction provided that such third party or its representatives are subject to legally binding obligations of confidentiality with respect thereto and do not use such information for any purpose other than such evaluation.

If either party is required (by oral questions, interrogatories, requests for information, subpoena, civil investigative demand, or similar process) to disclose any Confidential Business Information, it is agreed that such party will provide the other party with prompt written notice of such request(s) so that the other party may seek an appropriate protective order and/or waive compliance with the provisions of this section. If, failing the entry of a protective order or the receipt of a waiver hereunder, the party subject to the request is, in the opinion of its counsel compelled to disclose Confidential Business Information under threat of liability for contempt or other censure or penalty, it may disclose only that portion of such information as is legally required without liability; provided that the party agrees to exercise its best efforts to obtain assurance that confidential treatment will be accorded such information.

H.    Sales and Use Tax. Steelcase and Program Partner will cooperate in preparing and filing any applicable sales and use tax returns relating to, and Steelcase shall pay and be responsible for any and all sales and use taxes due with regard to, Steelcase's provision of the Services and Steelcase's receipt of Partner Fees and Logistic Fees hereunder. Program Partner shall pay and be responsible for any and all sales and use taxes due, and the preparing and filing of any applicable sales and use tax returns relating to purchases of Products by Authorized Steelcase Dealers. Steelcase will cooperate with Program Partner with respect to the collection of any information required for the filing of such returns and collection of any documents required to establish the taxability of any sale of Products made subject to this Agreement.

I.    Limitation of Liability. EXCEPT FOR DAMAGES ARISING OUT OF OR RELATING TO A BREACH OF ARTICLE II SECTION G OF THIS AGREEMENT, AMOUNTS PAYABLE UNDER ARTICLE III SECTION D OF THIS AGREEMENT, AND DAMAGES CAUSED BY PROGRAM PARTNER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, PROGRAM PARTNER WILL NOT BE LIABLE TO STEELCASE FOR INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES, EVEN IF SUCH DAMAGES WERE FORESEEABLE. EXCEPT FOR DAMAGES ARISING OUT OF OR RELATING TO A BREACH OF ARTICLE II SECTION G OF THIS AGREEMENT, AMOUNTS PAYABLE UNDER ARTICLE III SECTION D OF THIS AGREEMENT, DAMAGES CAUSED BY PROGRAM PARTNER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR PAYMENTS DUE UNDER ARTICLE II SECTIONS B 5 AND 6, IN NO EVENT WILL PROGRAM PARTNER'S TOTAL LIABILITY IN

CONNECTION WITH THIS AGREEMENT EXCEED $100,000. EXCEPT FOR DAMAGES ARISING OUT OF OR RELATING TO A BREACH OF ARTICLE III SECTION G OF THIS AGREEMENT, AMOUNTS PAYABLE UNDER ARTICLE II SECTION E OF THIS AGREEMENT, AND DAMAGES CAUSED BY STEELCASE'S GROSS NEGLIGENCE OR WILFUL MISCONDUCT, STEELCASE WILL NOT BE LIABLE TO PROGRAM PARTNER FOR INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES, EVEN IF SUCH DAMAGES WERE FORESEEABLE. EXCEPT FOR DAMAGES ARISING OUT OF OR RELATING TO A BREACH OF ARTICLE III SECTION G OF THIS AGREEMENT, AMOUNTS PAYABLE UNDER ARTICLE III SECTION E OF THIS AGREEMENT, DAMAGES CAUSED BY STEELCASE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR PAYMENTS DUE UNDER ARTICLE II SECTION B 6, IN NO EVENT WILL STEELCASE'S TOTAL LIABILITY IN CONNECTION WITH THIS AGREEMENT EXCEED $100,000.

## ARTICLE IV. GENERAL PROVISIONS

A. Notices. All notices, demands or requests provided for or permitted to be given pursuant to this Agreement must be in writing and received by the other party to whom they are addressed. All notices, demands and requests to be sent to a party under this Agreement shall be deemed to have been received (a) on the earlier of the actual date of its receipt or the tenth (10th) business day following the deposit of same in the United States mail, addressed to the party, postpaid and certified, return receipt requested ("U.S. Mail"); (b) on the next business day following the receipt of same by a recognized overnight delivery service, addressed to the party ("Courier"); (c) upon delivery to the party in the event of personal delivery; or (d) when made if by telephone facsimile transmission, telegram, telex or electronic mail and confirmed by U.S. Mail or Courier, addressed to the party at the following addresses or such other address as any party shall have notified the other in accordance with this paragraph:

If to Steelcase to:

Steelcase Inc.
901 44th Street SE
Grand Rapids, MI 49508

With a copy to:

ATTN: General Counsel
Steelcase Inc.
901 44th Street SE
Grand Rapids, MI 49508

If to Program Partner to:

Blu Dot Design & Manufacturing, Inc.
1321 Tyler Street Northeast
Minneapolis, MN 55413

With a copy to:

ATTN: Ryan Miest
Fredrikson & Byron, PA
200 South 6th Street, Suite 4000
Minneapolis, MN 55402

B.     Governing Law. This Agreement and the obligations of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of Michigan. Any dispute, claim, suit or action arising out of or in connection with this Agreement shall be brought in a court of competent jurisdiction in the County of Kent. Notwithstanding the foregoing, in the event of any dispute between Program Partner and Steelcase, prior to the pursuit of any formal legal action, Program Partner and Steelcase agree to allow their respective executives an opportunity to resolve the dispute for a period not to exceed thirty (30) days.

C.     Waiver. No consent or waiver, express or implied, by either party to or of any breach or default by the other party in the performance of such other party's obligations under this Agreement shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligations of such other party under this Agreement. Failure on the part of either party to complain of any act or failure to act of the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights under this Agreement.

D.     Severability. If a court of competent jurisdiction finds that any provision of this Agreement or the application thereof to any person or circumstances is invalid, illegal or unenforceable to any extent, the remainder of this Agreement and its application to other persons or circumstances shall not be affected thereby and such invalid, illegal or unenforceable provision shall be enforced to the greatest extent permitted by law.

E.     Additional Remedies. The rights and remedies of the parties under this Agreement shall not be mutually exclusive. Each of the parties confirms that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agrees that, in the event of a breach or threatened breach of any provision hereof other than payments required in the ordinary course of business, the respective rights and obligations under this Agreement shall be enforceable by specific performance, injunction or other equitable remedy.

F.     Other Business Activities; Disclosure; Waiver. Each of the parties acknowledges that the other party and/or its respective affiliates hold interests, either directly or

indirectly, in various other businesses and undertakings not included or addressed in this Agreement. Steelcase and Program Partner hereby agree that the creation of this Agreement and the assumption by each of the parties of their respective duties hereunder shall be without prejudice to their rights (or the rights of their affiliates) to have such other interests and activities and to receive and enjoy profits or compensation therefrom, and Steelcase and Program Partner each waive any rights it might otherwise have to share or participate in such other interests or activities of the other party or its affiliates. Steelcase and Program Partner may engage in or possess any interest in any other business venture of any nature or description independently or with others, and neither party shall have any right by virtue of this Agreement in and to such venture or the income or profits derived therefrom. Notwithstanding the foregoing, Steelcase and Program Partner shall each use commercially reasonable efforts to make the proposed relationship successful.

G.    Counterparts. This Agreement may be executed in any number of counterparts. All executed counterparts shall constitute one agreement notwithstanding that all signatories are not signatories to the original or the same counterpart.

H.    No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction will be applied against any person.

I.    Independent Contractors. The parties to this Agreement are independent contractors and nothing in this Agreement shall be deemed or construed as creating a joint venture, partnership, agency relationship, franchise or business opportunity between Program Partner and Steelcase. Neither party, by virtue of this Agreement, will have any right, power or authority to act or create an obligation, express or implied, on behalf of the other party. Each party assumes responsibility for the actions of their personnel under this Agreement and will be solely responsible for their supervision, daily direction and control, wage rules, withholding income taxes, disability benefits, or the manner and means through which the work under this Agreement will be accomplished.

J.    Parties in Interest. Nothing in this Agreement, expressed or implied, is intended to confer un any person other than the parties and their respective successors and permitted assigns any rights or remedies under or by virtue of this Agreement.

K.    Binding Effect; Assignment. All of the terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by Steelcase and Program Partner and their respective successors and permitted assigns.

L.    Entire Agreement. This Agreement and the attached Exhibits contain the entire agreement between Steelcase and Program Partner with respect to the matter contemplated herein. The following Exhibits are part of this Agreement and incorporated herein as referenced:

| Exhibits | Description |
|---|---|
| A | List of Products and Price List |
| B | Logistics and Transportation |
| C | Joint Automation of Product Ordering Process |
| D | Warranty |

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned duly authorized representatives of the parties to this Agreement have executed and delivered this Agreement.

**BLU DOT DESIGN & MANUFACTURING, INC.**

By: _____

Name: JOHN CHRISTAKOS

Title: CEO

**STEELCASE INC.**

By: _____

Name: Allan W. Smith

Title: Vice President Global Marketing

EXHIBIT A

LIST OF PRODUCTS AND PRICE LIST

All Blu Dot branded products offered for sale by Program Partner (as identified in the digital files Program Partner provides Steelcase for input into the Hedberg Data System from time to time), including pricing information, during the Initial Term and any Renewal Term, as applicable.

EXHIBIT B

LOGISTICS AND TRANSPORTATION

- Program Partner/Authorized Steelcase Dealers will provide copy of orders placed by Authorized Steelcase Dealers for Products (from Hedberg, manually, or as determined by Steelcase in its sole discretion) beginning the process of coordinating delivery.

- On a frequency of (to be determined by Steelcase within one hundred twenty' (120) days of the Effective Date), Steelcase trucks will pick up orders at the Program Partner's facility located outside of Minneapolis, MN.

- Steelcase will provide a scanning label to be printed by Program Partner at its location for placement on Product packaging. Program Partner will apply scanning labels on Product packaging. The scanning label will enable Steelcase to know which Products are being shipped to the appropriate Steelcase distribution center. Products will be loaded and counted onto Steelcase trucks by Program Partner personnel for delivery to the Steelcase Regional Distribution Center in Kentwood, MI. At the Kentwood regional distribution center, Steelcase will cross-dock Products for shipping back to other Steelcase regional distribution centers.

- Steelcase Transportation will manage the process of shipping Products to other Steelcase regional distribution centers, Authorized Steelcase Dealers and in some instances customer sites.

- Authorized Steelcase Dealer personnel will be responsible for unloading, preparation, delivery and installation of Products at customer locations.

- Lead times for Steelcase's logistics and transportation services hereunder will be consistent with standard lead times for such services within the Steelcase Dealer Channel. In the provision of such services, Steelcase will use commercially reasonable efforts to satisfy, in cooperation with Program Partner, the four (4) week maximum lead time for delivery of Products contemplated by Article II, Section B7 of this Agreement. If a shorter lead time is desired with respect to a particular Authorized Steelcase Dealer order, Program Partner will so notify Steelcase as soon as possible and the parties will mutually determine the appropriate logistics and transportation approach with Program Partner for that order. Steelcase Solutions Fulfillment Team will work with Program Partner for any issues or concerns arising out of logistics and transportation services. Issues or concerns regarding logistics and transportation may be initiated by Program Partner or any Authorized Steelcase Dealer.

EXHIBIT C

JOINT AUTOMATION OF PRODUCT ORDERING PROCESS

1. Program Partner and Steelcase IT and Logistics teams will work / have worked on setting up new automation capabilities including.

   a. Program Partner will provide its complete Product portfolio to Steelcase in a mutually agreeable format, media and frequency. Steelcase will use that data to simplify selection and specification of the Products within Steelcase's dealer automation tools, SmartTools and Hedberg. In addition, this data will be loaded onto Steelcase's internal systems to support its internal processes.

   b. Steelcase will share its dealer directory data with Program Partner in a mutually agreeable format, media and frequency. Program Partner will use this information to support its processes as desired. However, this data will not be shared by Program Partner with others outside its company.

   c. Steelcase, through its subsidiary, Hedberg Data Systems, will provide dealer purchase order data to Program Partner in a mutually agreeable format, media and frequency. Program Partner will use this information to streamline its order fulfill processes.

   d. Program Partner will provide to Steelcase copies of its orders from Authorized Steelcase Dealers in a mutually agreeable format, media and frequency. This information will be used by Steelcase to support its internal processes. This information will include shipping status from Program Partner warehouses.

   e. Steelcase will provide Program Partner with information in a mutually agreeable format, media and frequency relative to when specific Authorized Steelcase Dealer orders are planned to be picked up at Program Partner's warehouses by Steelcase contracted carriers.

   f. Steelcase will provide Program Partner with shipping labels in a mutually agreeable format, media and frequency.

2. Program Partner and Steelcase business as well as IT teams agree to work together beyond the initial implementation activities described above based on mutually agreed and reasonable requests for process or technology improvements initiated by either party.

EXHIBIT D

WARRANTY

Program Partner warrants each new Product to be free from material defects in workmanship under normal use for a period of one (1) year from the date of sale to Authorized Steelcase Dealer. If examination by Program Partner discloses a material defect in workmanship, Program Partner will repair or replace the Product, in its sole discretion, without charge. This warranty is offered to the original end user and is not assignable or transferable.

This warranty does not cover any defects not timely reported. This warranty does not cover any option or accessory not furnished by Program Partner, or damage caused by such options or accessories. This warranty does not cover damage caused by improper operation, testing, repair, modification, alteration, adjustment, installation, maintenance, normal wear and tear, accident or neglect. This warranty does not cover cost of labor for removal or reinstallation of the Product.

THIS WARRANTY IS EXTENDED BY PROGRAM PARTNER IN LIEU OF ALL OTHER WARRANTIES EITHER EXPRESSED OR IMPLIED INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY. PROGRAM PROVIDER WILL NOT BE LIABLE FOR ACTUAL, DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES, ARISING FROM ANY BREACH OF WARRANTY EVEN IF SUCH DAMAGES WERE FORESEEABLE.